**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**VINCENT M. CAMPITI**
Nemeth Feeney Masters & Campiti
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**SHARON R. ALBRECHT**
St. Joseph County Field Office
South Bend, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED

Dec 31 2012, 11:04 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.D., minor child, and M.D, the mother, | ) ) ) ) |
| M.D., | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) )     No. 71A03-1204-JT-204 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE ST. JOSEPH CIRCUIT COURT
The Honorable Peter J. Nemeth, Judge
Cause No. 71J01-1106-JT-76

**December 31, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

M.D. ("Mother") appeals the involuntary termination of her parental rights to her child, A.D. Mother challenges the sufficiency of the evidence supporting the trial court's judgment.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of A.D., born in October 2005.[1] The facts most favorable to the trial court's judgment reveal that in May 2009 the local St. Joseph County office of the Indiana Department of Child Services ("DCS") received an anonymous report alleging neglect and unsafe living conditions in the family home. DCS initiated an assessment and upon arriving at the home, the DCS assessment case manager observed numerous cats and rabbits roaming freely about the home. Animal feces littered the floors, moldy food was left out on the stove and kitchen countertops, dirty dishes were strewn about the living areas, and trash was observed overflowing the receptacles.

In addition to the deplorable conditions of the family home, it was further observed that A.D. was significantly developmentally delayed. Although approximately four years old, A.D. was not potty-trained, was almost completely non-verbal, and would hit, bite and kick to communicate her needs and desires. After speaking with Mother about the need to rectify the unsanitary conditions of the home, A.D. was taken into emergency protective custody.

---

[1] A.D.'s biological father, K.A. ("Father"), signed a voluntary consent for adoption pertaining to A.D. The trial court subsequently terminated Father's parental rights, and Father does not participate in this appeal. We therefore limit our recitation of the facts to those facts pertinent solely to Mother's appeal of the termination order.

The next day, a DCS case manager re-visited the family home and observed that most of the trash and clutter had been removed, the animal feces had been cleaned-up, and most of the dishes had been washed. Due to the improvements in the conditions of the home, A.D. was allowed to return to the family home contingent upon Mother's successful participation in a safety plan as part of an Informal Adjustment agreement with DCS.[2] The safety plan specified that Mother would keep her home clean, utilize the help of her own grandmothers as family resources by allowing them to assist Mother with basic weekly housekeeping, and cooperate with homemaker/parent aid services.

Soon after A.D.'s return to the family home, Mother began to refuse home-based services. Mother's refusal to allow homemaker/parent aid service providers enter the family home and her lack of compliance with the requirements of the safety plan resulted in DCS filing a petition alleging A.D. was a child in need of services ("CHINS"). A.D. was so adjudicated, and following a dispositional hearing in August 2009, the trial court issued an order formally removing A.D. from Mother's custody and making the child a ward of DCS. Although A.D. was allowed to remain in the family home as an in-home CHINS, the trial court's dispositional order directed Mother to participate in, and successfully complete, a variety of tasks and services designed to address her parenting deficiencies. Among other things, Mother was ordered to: (1) cooperate with home-based family services; (2) complete a psycho-parenting assessment and follow all

_____

[2] A Program of Informal Adjustment is a negotiated agreement between a family and DCS whereby the family agrees to participate in various services in an effort to prevent the child/children from being formally deemed a child in need of services. *See* Ind. Code 31-34-8 *et seq*.

3

resulting recommendations; (3) maintain a clean and safe environment for the child at all times; (4) obtain a stable and legal source of income; (5) cooperate with and maintain consistent contact with DCS; (6) take A.D. to complete an assessment at Madison Center; and (6) cooperate with the SNAP program through Joint Services. Mother was later ordered to participate in individual and family counseling, to take all medication for her depression as prescribed, and to exercise regular supervised visitation with A.D.

Mother's participation in court-ordered services continued to be sporadic throughout the CHINS case and ultimately was unsuccessful. Mother was argumentative and would use profane language when talking to service providers. She also initially refused to have A.D. assessed and failed to participate in the SNAP program.

In April 2010, A.D. was again removed from the family home due, in part, to ongoing unsanitary conditions of the family home caused by feces issues related to the bunnies. Mother also had refused to participate in home-based services and to reschedule missed appointments. Although Mother attended therapy each week, she failed to progress in this service.

Following A.D.'s removal, Mother experienced an improvement with her cooperation and progress in court-ordered services. As a result, in January 2011, A.D. was returned to the family home for a trial in-home visit with the added conditions of a safety plan. Although Mother successfully complied with portions of the trial court's orders, such as taking A.D. to school every day and participating in individual therapy, Mother's participation in home-based services began to decline again once A.D. was returned to her care. For example, Mother would disengage from home-based services

4

by ignoring the home-based counselor during sessions and watching television. The sanitary conditions of the family home also continued to be a problem, due in large part to the rabbits that were allowed to roam free in the home.[3] There were also two cats living in the family trailer.

In March 2011, DCS filed a petition seeking to remove A.D. from the family home once again. In support of its petition, DCS indicated that in addition to Mother's failure to comply with several of the trial court's dispositional orders, DCS was concerned about disturbing new behavior demonstrated by A.D. when the child severely harmed several kittens. After locking Mother out of the trailer, A.D. proceeded to cut several of the newborn kittens with scissors. One kitten sustained injuries that the veterinarian's office described as an "unsuccessful decapitation attempt." *State's Ex*. Cat 42. That kitten later died.

DCS's petition to modify the dispositional decree was granted, and A.D. was again removed from Mother and placed in foster care. In June 2011, Mother's visitation privileges were suspended based on the recommendation of A.D.'s therapist, who indicated that A.D. had begun exhibiting negative behaviors both before and after visits with Mother. The same month, DCS filed a petition seeking the involuntary termination of Mother's parental rights to A.D. based on Mother's continuing non-compliance with court orders and lack of progress in services.

A two-day evidentiary hearing on the termination petition was subsequently held in March 2012. During the termination hearing, DCS presented substantial evidence

---

[3] The record reveals that during the underlying proceedings, Mother's two pet rabbits eventually multiplied to a total of twelve rabbits.

establishing that Mother had failed to successfully complete and/or benefit from a majority of court-ordered reunification services available throughout the underlying CHINS and termination cases. In addition, DCS established that Mother remained incapable of providing A.D. with a safe, sanitary, and stable home environment. As for A.D., DCS presented evidence showing that A.D.'s behavior and emotional well-being were improving in the loving and stable environment of her relative foster family.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On March 23, 2012, the court entered its judgment terminating Mother's parental rights to A.D. Mother now appeals.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact

6

and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

7

> > (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services; [and]

> (C)   that termination is in the best interests of the child  . . . .

Ind. Code § 31-35-2-4(b)(2).[4]   The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"  *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).  Moreover, if the court finds that the allegations in a petition described in Indiana Code section 31-35-2-4 are true, the court *shall* terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).  Mother challenges the sufficiency of the evidence supporting the trial court's findings as to subsection (b)(2)(B) of the termination statute cited above.[5]

Indiana Code section 31-35-2-4(b)(2)(B) requires the trial court to find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence before terminating parental rights.  Here, the trial court determined that DCS established, by clear and convincing evidence, subsections (b)(2)(B)(i) and (ii) of the termination statute.  Because we find it to be dispositive under the facts of this case, we shall consider only the former requirement, namely, whether DCS sufficiently established that there is a reasonable probability the conditions resulting in A.D.'s

---

[4] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

[5] To the extent that Mother argues that the trial court's findings are insufficient to support a determination that termination of her parental rights is in A.D.'s best interests, she has waived this argument on appeal.  Mother fails to appropriately develop or support her argument, as it merited only two conclusory sentences in her Appellant's Brief.  *See* Ind. Appellate Rule 46(A)(8)(a) (requiring conclusions to be "supported by cogent reasoning" and "citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on").

removal or continued placement outside of Mother's care will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider any services offered to the parent by the county department of child services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, DCS was not required to provide evidence ruling out all possibilities of change; rather, it needed to establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Mother asserts on appeal that the "State's entire case is solely based on speculation and an overemphasis on the incident [with the kittens] which occurred in April 2011." *Appellant's Br.* at 12. Mother goes on to assert that DCS has "stretched the implications of this event to mean that Mother has continued prior bad acts, continued a prior inability to supervise the child and otherwise." *Id.* Mother thereafter insists she is

entitled to reversal because the trial court should have "only focused on whether the State could show by clear and convincing evidence that Mother was unable to care for the child at the time of the hearing" and there was "no evidence whatsoever to support a ruling based on the present state of Mother's parenting skills and health." *Id.* at 12-13.

In terminating Mother's parental rights, the trial court made detailed findings regarding Mother's habitually neglectful parenting, the traumatic impact Mother's inappropriate behaviors had on A.D.'s health and well-being, and Mother's failure to fully engage in and benefit from court-ordered reunification services. Specifically, the court noted the circumstances surrounding A.D.'s removal, including the "unsanitary conditions" of the family trailer, which included "cats and rabbits roaming freely throughout the house with feces scattered throughout the house," as well as Mother's "failure to provide adequate supervision and nurturing of the child." *Appellant's App.* at 8. The court also noted that at the time of the child's initial removal in May 2009, then four-year-old A.D. was "not verbal," "not potty trained," and "extremely defiant." *Id.* at 7.

Regarding A.D.'s behaviors throughout the CHINS case, the court observed that A.D., who was diagnosed with Oppositional Defiant Disorder (ODD) and Reactive Attachment Disorder (RAD) exhibited many inappropriate social and interpersonal behaviors including being physically "cruel to animals" by "cutting kittens in her family's possession with scissors," using "foul and vulgar language both at home and away from home" to include "sexual innuendos" and exhibiting "provocative physical

behavior" such as "sitting in the laps of adult men and grinding her pelvic area, pulling up her dress and using foul, inviting language" and "kissing strangers on the mouth." *Id.*

Regarding Mother's behaviors during the underlying CHINS and termination cases, the trial court specifically found that Mother is "inappropriate with [A.D.], is impulsive, has difficulty understanding parenting[,] and struggles with setting boundaries for [A.D.]" *Id.* at 8. The court also found Mother "is not a consistent and reliable caretaker," "is impatient and verbally abusive," has "failed and refused to follow the case plan," and does not have the "emotional maturity to handle parenting." *Id.* Based on these and other findings, the trial court concluded that there is a reasonable probability the conditions resulting in the removal of A.D. from Mother's care will not be remedied. Our review of the record leaves us convinced that clear and convincing evidence supports the trial court's findings cited above.

The evidence clearly establishes that Mother failed to achieve any significant, long-term improvement in her ability to care for and parent A.D. despite a wealth of services available to her for nearly three years. Moreover it was the general consensus of all caseworkers and service providers that Mother's ability to safely and effectively parent A.D. would likely never improve.

During the termination hearing, A.D.'s therapist, Geri Bough ("Bough"), testified that there is a history of "significant parent/child issues," between A.D. and Mother and that Mother was "not able to set limits during family therapy with [A.D.] at all, was not following recommendations, [and] was not engaged in the process." *Tr.* at 27. Bough further observed that A.D.'s behavior did not improve until the child was "removed"

11

from the family home and visitation with Mother was "stopped." *Id.* In addition, Bough testified:

> [H]istory[,] obviously[,] is the best predictor of behavior and future behavior and the concern has been that this has been an ongoing issue of being able to provide for [A.D.'s] needs, provide the stability that she needs, provide the supervision that she needs. . . . From what I understand from Ms. Holtz [Mother's therapist][,] there has been no significant progress on the therapeutic level to warrant there being a change.

*Id.* at 37-38. Bough thereafter acknowledged that the "best thing" for A.D. is "to never see her mother again." *Id.* at 38.

Mother's therapist likewise confirmed that Mother had failed to make significant progress in developing appropriate parenting skills. When asked if she would have any concerns if A.D. was returned to Mother's care, Holtz replied, "Yes, I do." *Id.* at 69. Holtz further stated:

> I have a lot of concerns that [Mother] wouldn't be able to manage her behaviors . . . I think she would have trouble handling her own emotions because patience is something she really lacks and patience is something that's very important to being a good parent. . . [S]o, I just feel she's still emotionally unstable and would be unstable given a lot of stressors in parenting.

*Id.* at 69-70. Moreover, Holtz testified that "many parents would have trouble parenting a child that displays the problems that [A.D.] has," and that she just did not believe that Mother had the "skill" to parent A.D. *Id.* at 84.

Finally, in recommending termination of Mother's parental rights to A.D., DCS case manager Emily Russell ("Russell") informed the trial court that although most reports indicated Mother was "loving" toward A.D. during supervised visits, Mother nevertheless required "a lot of direction and prompting" when it came to "setting limits,

finding appropriate activities to do" and "maintaining appropriate topics to talk about." *Id.* at 101. Russell also reported that "[e]ach time" A.D. was returned to Mother's care, the child's behavior "regressed significantly and she began to become more defiant and more aggressive and I do not believe [Mother] has the consistency, the stability[,] and the . . . ability to maintain [A.D] and to put in the effort to give her the supervision and the redirection and the discipline that she needs." *Id.* at 132. Russell later explained, "I believe that [Mother's] home environment and parenting skill set will lead to inevitable neglect in the future as they have in the past, yes." *Id.* at 180.

As noted above, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's *habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child. *D.D.*, 804 N.E.2d at 266. Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, the record makes clear that throughout the underlying proceedings Mother demonstrated a persistent unwillingness and/or inability to take the actions necessary to show that she is capable of providing A.D. with the safe, stable, and sanitary home environment the child needs to thrive. Based on the foregoing, we conclude that the trial court's determination that there is a reasonable probability the conditions leading to A.D.'s removal from the family home will not be remedied is supported by clear and convincing evidence. Mother's arguments to the contrary amount to an impermissible invitation to reweigh the evidence. *D.D.*, 804 N.E.2d at 265.

This court will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (*quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

MATHIAS, J., and CRONE, J., concur.